**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMCA-106**

**Filing Date: August 10, 2009**

**Docket Nos. 28,472 & 28,678 consolidated**

**VICTOR GUTIERREZ,**

       **Worker-Appellee/Cross-Appellant,**

**v.**

**INTEL CORPORATION,**
**Self-Insured,**

       **Employer-Appellant/Cross-Appellee.**

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Gregory D. Griego, Workers' Compensation Judge**

Attorney at Law, P.C.
Leof T. Strand
Albuquerque, NM

for Appellee

Maestas & Suggett, P.C.
Paul Maestas
Albuquerque, NM

for Appellant

**OPINION**

**VIGIL, Judge.**

**{1}** This workers' compensation appeal is a sequel to *Baca v. Complete Drywall Co.*, 2002-NMCA-002, 131 N.M. 413, 38 P.3d 181 (filed 2001), which requires us to determine whether the workers' compensation judge (WCJ) correctly awarded Worker benefits beyond the 500-week period set by NMSA 1978, Section 52-1-42(A)(2) (1990). In *Baca*, the worker had an injury to a scheduled member, as well as a non-scheduled injury, and we held that the benefits period for the scheduled member could be added to the benefits period for the non-

1

scheduled injury. 2002-NMCA-002, ¶ 27. In the current case, Worker fell off a ladder in 1996, injuring his left foot and back. The WCJ followed *Baca*, added both benefits periods together, and allowed 615 weeks of benefits.

**{2}**     Both Employer and Worker appeal. Employer contends that *Baca* is inapplicable, and that Worker is limited to 500 weeks of benefits, beginning on the date of the accident. Worker contends that he is entitled to 699 weeks of benefits and that benefits for his back injury should have begun on June 14, 2005, the date he had back surgery.

**{3}**     We affirm the compensation order in all significant respects. We hold that *Baca* applies and justifies more than 500 weeks in benefits. As to Worker's cross-appeal, we reject his contention that the 500-week period for benefits for his back injury should have begun on the date of his back surgery. However, we agree with his claim that he is owed $859.08 for the time period between April 13 and May 1, 2006.

**BACKGROUND**

**{4}**     On November 30, 1996, Worker slipped off a ladder and fell approximately five feet, landing on his left heel and injuring his left foot. He tore the plantar fascia in his foot and injured his plantar nerve. He landed on his left side and injured his back as well. The evidence presented at trial in 2008 detailed Worker's consistent foot, leg, and back pain, and his progressive decline over a long period of time since the accident.

**{5}**     In January 1997, Worker began to see Dr. Laura Mitchell, who concluded Worker's "physical findings were consistent with a plantar fascia tear and resultant compression of the first branch of the lateral plantar tear." In October 1997, Dr. Mitchell stated that conservative measures had failed and Worker underwent surgery on his foot in January 1998. In June 1998, Worker began seeing Dr. Brian Delahoussaye, who referred Worker back to Dr. Mitchell in September 1998 for possible scar exploration. In December 1998, Dr. Mitchell performed her second surgery on Worker, and in February 1999, Dr. Mitchell noted that Worker was worsening instead of improving. In April 1999, Dr. Mitchell turned Worker's care over to Dr. Delahoussaye. Dr. Delahoussaye noted his opinion in June 1999, that "[Worker] is not going to benefit from any additional interventions." Worker saw Dr. Mark Haas, a podiatrist, from July 20, 1999, to March 12, 2002. Dr. Haas performed surgery on Worker's left foot on October 28, 1999, and a second surgery to the same foot on November 30, 2001.

**{6}**     In 2000, Dr. Theresa Elliott noted that Worker had "recurrent low back pain and left leg pain" since his accident in 1996 and that he was progressively getting worse. In 2001, Dr. Elliott noted that he had degenerative disc disease and other spinal problems.

**{7}**     Dr. Pamela Black first saw Worker in 2002. At that time, he was complaining of left back, foot, and hip pain. His MRI indicated spondylolisthesis at L5-S1, which she described as a disc improperly lined up, and spondylolysis, a fracture in the back part of the spine. In

2

early 2003, she felt he was in need of chronic pain management for nerve pain. By October 2003, Worker required five to seven pain medications per day to keep his pain under control. Dr. Black also tried to treat Worker's leg pain with a caudal epidural injection, which involves bathing the spine with medication. In November 2004, Worker still had pain radiating down his leg. By December 2004, Worker had to lie down each day at 4:00 p.m. because he was unable to do anything else and still had low back pain and left leg "nerve" pain. By March 2005, it was hard for Worker to walk by the end of the afternoon.

{8}     Dr. Claude Gelinas, a spine surgeon, noted that when he first saw Worker in April 2005, Worker complained of back pain radiating down his left leg ever since the accident in 1996. Worker had been through all forms of conservative treatment, was on narcotic pain medication daily, and reported worsening pain. Dr. Gelinas stated that Worker's disc problem, isthmic spondylolisthesis, could cause the kind of radiating pain Worker reported. Spondylolisthesis is congenital, but it can become symptomatic from trauma. Dr. Gelinas stated that, to a reasonable medical probability, Worker's back and leg pain were directly attributable to the 1996 accident. Dr. Gelinas performed surgery on June 14, 2005, to repair the disc. The surgery resulted in a stable disc, and Worker reached maximum medical improvement (MMI) on May 1, 2006.

{9}     However, even after back surgery, Worker continued to have problems. In 2006, Dr. Black tried other treatments to address Worker's continuing pain. In February 2006, she tried trigger point injections to alleviate his back spasms. He was on Demerol at night for pain control. In March 2006, she tried a selective nerve root block in which medication is injected into the area where the nerves come out of the spine and start down the leg, but it did not help. In August 2006, Worker was still having leg pain and back spasms. Dr. Black thought that the 1996 accident could have caused Worker's anatomical spine abnormalities to become symptomatic. She noted that Worker's gait problems from his injuries could also have played a role and that his injuries had progressed over time.

{10}    After considering the evidence, the WCJ determined that, combining the foot injury and the back injury, Worker was entitled to 615 weeks of benefits, beginning on the date of the accident. Employer contends benefits should be limited to 500 weeks while Worker contends benefits should be for 699 weeks.

**DISCUSSION**

{11}    This appeal presents both factual and legal issues. In a workers' compensation case, we apply a whole record review when assessing whether there is substantial evidence to support the WCJ's decision. *Chavarria v. Basin Moving & Storage*, 1999-NMCA-032, ¶ 11, 127 N.M. 67, 976 P.2d 1019. "In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact finder." *Levario v. Ysidro Villareal Labor Agency*, 120 N.M. 734, 737, 906 P.2d 266, 269 (Ct. App. 1995). To the extent this appeal presents legal issues and issues of statutory construction,

3

we review those questions de novo. *Baca*, 2002-NMCA-002, ¶ 12.

**1.      Application of *Baca***

**{12}**    The Workers' Compensation Act, NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2007), addresses scheduled injuries—injuries to a specified body part—as well as non-scheduled injuries. *Compare* § 52-1-43, *with* § 52-1-42. In *Baca*, the worker had scheduled injuries to the knees. Over time, the knee injuries caused shoulder problems, which are not scheduled injuries. 2002-NMCA-002, ¶¶ 3-5. The employer argued that scheduled injuries are simply a special kind of permanent partial disability, and therefore the scheduled injury benefits should be deducted from the 500-week period that the worker would be entitled to receive benefits for his shoulder problems. *Id.* ¶ 14. We rejected the employer's contention, holding that scheduled injuries are separate and distinct from non-scheduled injuries. *Id.* ¶ 21. Accordingly, we allowed the worker to recover more than 500 weeks in benefits. *Id.* ¶¶ 24-25.

**{13}**    In the current case, the WCJ followed *Baca*, allocated 500 weeks for the back injury, and another 115 weeks for the foot injury, for a total of 615 weeks. *See* § 52-1-43(A)(32) (providing that the benefits period for a scheduled injury to a foot is 115 weeks). Employer argues that *Baca* is inapplicable. Employer contends that *Baca* is distinguishable because in that case the worker had a scheduled injury or injuries that later caused the shoulder problems. In contrast, in the current case, Worker's foot and back injury occurred at the same time. Employer argues that this factual distinction means that *Baca* is inapplicable. Employer argues that where, as here, the scheduled injury and the non-scheduled injury all occur at the same time, then the 500-week limitation in Section 52-1-42 applies.

**{14}**    We disagree. We see no compelling reason to depart from *Baca*'s rationale that scheduled injuries and non-scheduled injuries are separate and distinct concepts. 2002-NMCA-002, ¶ 21. If a worker whose scheduled injury leads to a progressive deterioration resulting in a later injury to a non-scheduled member is entitled to a longer benefits period, we see no reason why a worker should be subjected to a different rule because he or she has the misfortune to suffer the scheduled and non-scheduled injuries at the same time. Moreover, in *Baca*, we reached our result after engaging in statutory construction. Employer has not pointed to any language in the Act that would result in a different statutory construction when scheduled and non-scheduled injuries occur at the same time. Consequently, we follow *Baca* here.

**{15}**    The point of the Act is to compensate workers for injuries caused by their employment while being fair to the employer. *See Smith v. Ariz. Pub. Serv. Co.*, 2003-NMCA-097, ¶ 17, 134 N.M. 202, 75 P.3d 418. The Act represents a quid pro quo in which the employee gives up his or her common law rights in exchange for compensation, and the employer has limited potential liability in exchange for providing compensation. *See Hall v. Carlsbad Supermarket/IGA*, 2008-NMCA-026, ¶ 20, 143 N.M. 479, 177 P.3d 530 (filed 2007). We do not favor constructions of the Act that limit a worker's ability to recover for

4

the full extent of his or her injuries. *Id.* (stating that the purpose of the Act is not advanced by adopting technical or overly restrictive constructions that impede an injured worker's ability to obtain compensation).

**{16}** These polices support our conclusion that a worker should be fairly compensated for the full extent of his or her injuries. Here, Employer does not dispute that all of Worker's injuries were caused by his accident in falling off the ladder, or that Worker's progressive deterioration is a direct result of that accident. Employer's only argument is that Worker's benefits period should be limited to 500 weeks. The foundational policies of the Act do not warrant such a restrictive reading of the Act. On this record, there is no serious dispute that Worker has not been the same since the accident and never will be the same. We see no reason to narrowly limit *Baca*, or to interpret the Act, in a way that will limit Worker's benefits to 500 weeks. We conclude that the WCJ's application of *Baca*, and award of 615 weeks of benefits, is correct.

**{17}** Employer relies on *Baca*'s language that allowing Worker to combine scheduled injury benefits and non-scheduled injury benefits "will, in effect, restart the period during which benefits are to be paid every time a condition is aggravated," and our comment "that this is not the intended effect of our ruling." 2002-NMCA-002, ¶ 26. Employer argues that if we allow Worker to obtain more than 500 weeks of benefits for all of his injuries, we will be inappropriately expanding the Act and will be allowing exactly what we said in *Baca* we would not allow. We disagree. Under the facts in this case, by allowing scheduled injury benefits and non-scheduled injury benefits to be added, we are not "restarting" the period based on the aggravation of a condition. We are simply following *Baca*'s core principle that two kinds of benefits may be added together.

**2.      Worker's Cross-Appeal**

**{18}** Worker's cross-appeal argues that the compensation order's 615-week benefits period is too short. He contends that he is entitled to 699 weeks of benefits. He argues that the 500-week period for his back injury should begin as of June 14, 2005, the date of his back surgery. He claims that this is because no doctor gave him an impairment rating for his back before this date.

**{19}** The date of disability is a factual question. *See Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 30, 137 N.M. 497, 113 P.3d 320. The WCJ determined that, for all purposes, the date of disability was November 30, 1996, the date of the accident. Reviewing the whole record, this determination is adequately supported. The evidence is undisputed that Worker complained of low back pain consistently from the date of the accident to the date of trial. In 2002, Dr. Elliott noted that Worker's low back pain was related to the accident. The evidence, which we have already discussed, establishes that Worker was highly symptomatic from his low back, down into his left foot, over a long period of time, beginning at the time of the accident. Worker himself testified that his foot and back pain had been consistent since the accident, that his back pain never went away, and that the pain

5

had affected his ability to engage in physical activity and to work. He testified that, from the date of the accident until his back surgery, his back got worse.

**{20}** As we stated in *Baca*, it is the disability caused by the accident, not the accident itself, that triggers the liability for benefits. "[W]hen there is a delay between the accident and the resulting disability, as occurred with [the w]orker's right knee and the bilateral shoulder condition, entitlement to compensation begins on the date of the disability rather than the date of the accident." 2002-NMCA-002, ¶ 15. In *Baca*, the worker's shoulder problem did not develop on the date of the accident, but instead developed later. Accordingly, in that case it was appropriate to begin the benefits period when the shoulder problem manifested itself.

**{21}** This case, however, is factually distinguishable. Unlike the situation in *Baca*, Worker's back was injured in the accident and continued to be consistently symptomatic from the time of the accident until back surgery and even after surgery. Therefore, the whole record supports the WCJ's decision to use the date of the accident as the trigger for the benefits for Worker's back. The back surgery, performed approximately eight years after the accident, is not like the development of shoulder problems experienced by the worker in *Baca*.

**{22}** Therefore, we disagree with Worker's contention that his back surgery started the 500-week benefit period. The surgery was performed to address a progressive deterioration and did not recommence the benefit period. Worker's argument presents the scenario we addressed, and rejected, in *Baca*. Were we to start the benefit period on the date of the back surgery, performed approximately eight years after the accident, we would be restarting the benefits period every time a condition is aggravated, or every time surgery is performed, to address an ongoing condition. *Baca* expressly cautioned that this was not the intent of our ruling. *Id.* ¶ 26.

**{23}** Finally, Worker claims that he has not been paid total temporary disability benefits, totaling $859.08, for the period between April 13 and May 1, 2006, the date of MMI. Employer's briefs do not respond to this claim, and therefore we assume Worker is correct. *See Ferrell v. Allstate Ins. Co.*, 2007-NMCA-017, ¶ 49, 141 N.M. 72, 150 P.3d 1022 (filed 2006) (stating that where a party does not respond to an issue, we may hold in the other party's favor without analyzing the issue), *rev'd on other grounds*, 2008-NMSC-042, 144 N.M. 405, 188 P.3d 1156; *Delta Automatic Sys., Inc. v. Bingham*, 1999-NMCA-029, ¶ 31, 126 N.M. 717, 974 P.2d 1174 (filed 1998) (noting that failure to respond to an issue constitutes concession on the matter, and stating that this Court has no duty to search the record or research the law to defend a party that fails to defend itself on an issue). Employer shall pay this amount to Worker within thirty days from the mandate in this case.

**{24}** For these reasons, we affirm the compensation order. Worker's cross-appeal is denied except for Worker's claim that he is entitled to payment for the time period between April 13 and May 1, 2006. Worker's attorney is to be awarded attorney fees for this appeal

in an amount to be determined by the WCJ.

**{25}   IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**ROBERT E. ROBLES, Judge**

**Topical Index for _Gutierrez v. Intel_, No. 28,472/28,678**

| | |
|---|---|
| **ST** | **STATUTES** |
| ST-RC | Rules of Construction |
| | |
| **WC** | **WORKERS COMPENSATION** |
| WC-BC | Basis for Compensation |
| WC-BG | Benefits, General |
| WC-DD | Date of Disability |